UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

ABN AMRO MORTGAGE GROUP, INC.,    )
                                  )
        Plaintiff,                )
                                  )
v.                                )       CIVIL NO.  1:04cv492
                                  )
MAXIMUM MORTGAGE, INC., et al.,   )
                                  )
        Defendants.               )

OPINION AND ORDER

This matter is before the court on a motion to dismiss filed by certain defendants[1] on

February 17, 2005.  The plaintiff, ABN AMRO Mortgage Group, Inc.  ("ABN"), filed its

response on March 17, 2005.  to which the defendants replied on March 31, 2005.

Standard of Review

As stated in Satyshur v.  General Motors Corp., 38 F.  Supp.  2d 744, 746 (N.D. Ind.

1999):

> In determining the propriety of dismissal under Fed.R.Civ.P.
> 12(b)(6), the court must accept as true all well-pled factual
> allegations in the complaint and draw all reasonable inferences
> therefrom in favor of the plaintiff.  The purpose of the motion to
> dismiss is to test the legal sufficiency of the complaint and not to
> decide the merits.  The court may dismiss the complaint only if it
> is clear that no relief could be granted under any set of facts that
> could be proved consistent with the allegations.

Discussion

ABN is in the wholesale mortgage business, and is the fourth or fifth largest wholesale

lender in the United States.   ABN buys loans from 4,000 to 5,000 mortgage brokers across the

---

[1] The moving defendants are Rex Wells, Eilatan, Indiana Resource Network, and
Alliance Property Management (collectively referred to herein as "Wells").

country.  The brokers are agents of the mortgage borrowers, and assist the borrowers in

obtaining loans to purchase real estate.  A broker's obligation is to gather all of the necessary

information for ABN to make an informed lending decision, including completion of the loan

application, verification of employment, appraisals, and verification of funds.  The broker then

offers to sell the loan to a mortgage company.  Maximum Mortgage, Inc.  ("Maximum

Mortgage") is an Indiana mortgage broker who did business with ABN.

Defendant Rex Wells, individually and through business entities he controls, invests in

residential properties.  On dates not specified in the Complaint, Wells sold 79 houses to "the

Nulls".  Additionally, Wells sold 70 houses to "Brogren".  Both the Nulls and Brogren wanted to

acquire real estate rental investments.  ABN made loans to the Nulls and Brogren to finance the

acquisition of each of the properties from Wells.

In its Complaint, ABN alleges that the loans it made to the Nulls and Brogren were in

excess of the actual values of the properties.  ABN alleges that it was induced to make the loans

as a result of fraudulent and/or other inappropriate conduct by a variety of defendants, including

the mortgage broker, title company, and appraiser involved in the transactions.  ABN alleges

several theories of liability.  As to defendant Wells, ABN advances common-law claims of fraud,

tortious interference with the contractual and/or business relations, civil conspiracy, and unjust

enrichment.  The Complaint also alleges statutory claims against Wells based on Indiana's Bank

Fraud Statute and Criminal Deception Statute.  Finally, ABN asserts a RICO claim against

Wells.  Wells has moved to dismiss all counts.[2]

---

[2] In his reply brief, Wells acknowledges that ABN has adequately pled a cause of action
for damages based on civil conspiracy.  (Reply Brief at 7).  Thus, this claim will not be discussed
in this order.

FRAUD CLAIMS - COUNT II

In support of its motion to dismiss, Wells first argues that ABN has failed to state a claim for fraud because it has failed to plead the circumstances of fraud with adequate particularity. Rule 9(b) states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistakes should be stated with particularity."  Thus, the Complaint must state "the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff."  Vicom, Inc. v.  Harbridge Merchant Services, Inc., 20 F.3d 771, 777 (7th Cir.  1994). Rule 9(b) serves three main purposes: (1) protect a defendant's reputation from harm; (2) minimize "strike suits" and "fishing expeditions"; and (3) provide notice of the claim to the adverse party.  Jepson v.  Makita Corp., 34 F.3d 1321, 1327 (7th Cir.  1994).  The last of these considerations -- fair notice to the defendant -- is perhaps the most basic consideration underlying Rule 9(b).  Vicom, 20 F.3d at 777-78.

Additionally, Rule 8's general pleading requirement and Rule 9(b)'s particularity requirement must be read in conjunction with one another.  Heastie v.  Cmty.  Bank of Greater Peoria, 690 F.  Supp.  716, 722 (N.D. Ill.  1988).  Thus, a plaintiff need not plead evidentiary details.  Heastie, 690 F.  Supp.  at 722.  The requirements of Rule 9(b) "are not absolute or unbounded; defendants need not be given a pretrial memorandum containing all of the evidentiary support for plaintiff's case."  Uniroyal Goodrich Tire Co.  v.  Mutual Trading Corp., 749 F.  Supp.  869, 872 (N.D. Ill.  1990).  "In fact, to satisfy the requirements of Rule 9(b), it is not even necessary to plead each element of fraud in detail so long as the 'circumstances constituting fraud' are stated with particularity."  U.S. v.  Lutheran Hospital, 1998 WL 1753335,

3

at *6 (N.D. Ind.  April 17, 1998).

ABN presents its claims of fraudulent misrepresentations in Count II of its Complaint. As to Wells, Count II (at Paragraph 110) alleges that:

> Wells knowingly misrepresented to both the Nulls and Brogren: the condition of the Properties; the likely appraisal value of the Properties; the actual appraised value of the Properties; the current profitability of the Properties; the feasibility of increasing the rental income from the Properties; the likelihood of selling the Properties to the current tenants; and the amount of maintenance required in relation to the Properties."

Wells claims that the principal defect in all of the allegations is that while they set out the subject matter of the alleged misrepresentation, they do not actually identify the content of the alleged misstatement.  For example, the Complaint alleges that Wells made misrepresentations as to the condition of the properties, but does not say what Wells actually said about the condition of the properties.  Wells argues that because the Complaint fails to actually state the content of the alleged misrepresentations, it fails to meet the particularity requirements imposed by Rule 9(b).  Wells contends that the same is true as to each of the other alleged misrepresentations outlined in Paragraph 110. [3]  Wells further argues that the Complaint also fails to state when Wells made these statements and that this omission is another fatal defect in the fraud claim.

In response, ABN claims that Wells is attempting to hold ABN to an unduly restrictive

---

[3]  Wells acknowledges that ABN does set forth the content of one alleged misstatement. In Paragraph 28, the Complaint alleges that "Wells also indicated that he had owned the properties for a number of years when, in fact, he had recently purchased many of the properties".  However, Wells argues that there is no allegation that this statement alleged to have been made to the Nulls was ever passed on to ABN and, therefore, it cannot serve as a basis for ABN's fraud claim.

standard and ignores numerous allegations throughout ABN's Complaint.  ABN argues that

when its Complaint is considered in its entirety, it is clear that the Complaint satisfies Rule 9(b).

ABN points out that its Complaint contains 179 paragraphs of allegations detailing an elaborate

real estate fraud scheme.  ABN points out that several of the defendants who are alleged to have

committed fraud (like Wells) filed answers.  ABN argues that their answers show that the

Complaint does sufficiently allege fraud.

ABN states that its Complaint alleges that it was induced to fund and then overfunded the

initial purchase of a number of residential properties through misrepresentations of ownership,

value, and loan purpose.  ABN claims that it has also clearly alleged Wells' role as a profiting

director and mastermind of the scheme.[4]

ABN further argues that it has sufficiently alleged the "what" and "when" of the

misrepresentations involved in the fraud scheme.  ABN points out that numerous

misrepresentations were clearly contained in ABN's Complaint.  These fraudulent

representations (which were allegedly made at Wells' direction) include: statements concerning

the purpose of the loans[5], the value of the properties involved[6], the condition of the properties

---

[4]  "Each of the Properties were appraised by Chevalier ... at the direction of Maximum
Mortgage or Wells.  Chevalier valued the Properties greatly in excess of fair market value... .
Wells masterminded and profited the most from the scheme detailed above."  (Complaint at ¶¶
59, 80).

[5]  "The loan applications submitted by Maximum Mortgage stated that the purpose of
each of the loans was to refinance the real estate described in the loan application.  In fact,
however, the purpose of each loan was to finance the original acquisition of each of the
properties described in each loan application."  (Complaint at ¶ 45).

[6]"Chevalier intentionally over-valued the Properties."  (Complaint at ¶ 61).

involved[7], and the status of the titles to the various properties.[8]  ABN notes that Wells has
conceded that ABN has alleged the <u>subject matter</u> of the misrepresentations, but simultaneously
argues that ABN has failed to allege the <u>content</u> of the misrepresentations.  ABN argues that this
is a distinction without a difference and has no basis in law.  ABN reiterates that Rule 9(b) only
requires that a party allege the circumstances constituting fraud.  <u>Lutheran Hospital</u>, 1998 WL
175335 at *6.

With respect to when the alleged fraud occurred, ABN acknowledges that it does not
identify the exact date of each misrepresentation, but argues that this exacting degree of
specificity is not required under Rule 9(b).  ABN submits that the fraud scheme in the present
case involves the finance and purchase of numerous real estate parcels.  ABN has alleged
misrepresentations in connection with the loan applications and loan closings involving that real
estate.  ABN has identified approximately when the fraudulent scheme began.  For example, the
Complaint provides: "In early 2002, the Nulls decided they wanted to work together and own
their own business. . . . The Nulls spent several weeks looking at properties . . . .  Justin Stuckey
introduced the Nulls to Wells."  (Complaint at ¶¶ 24-26).

In addition, ABN's Complaint contains allegations regarding one real estate parcel as a
representative sample.  Paragraph 58 of the Complaint provides:

> For example, one of the properties that the Nulls purchased is
> located at 2747 Abbott in Fort Wayne.  The closing date of the
> loan on this property was June 21, 2002 and the effective date of

---

[7] "Wells misrepresented the condition of the Properties to the Nulls and Brogren."
(Complaint at ¶ 71).

[8] "Wells also indicated that he had owned the Properties for a number of years when, in
fact, he had recently purchased many of the properties."  (Complaint at ¶ 28).

> the title commitment was April 26, 2002. Title to this supposed
> "refinance" loan was first acquired by the Nulls the day before the
> closing, June 20, 2002. Moreover, the title commitment includes a
> special exception for a mortgage said to be dated June 19, 2002
> and recorded on June 25, 2002. Thus, the exception is apparently
> for a mortgage that was not recorded at the time of the closing.
> Documentation of the foregoing is attached to this Complaint as
> Exhibit "B".

Exhibit B to the complaint is a title commitment with respect to one property, which specifies

dates and contains information about that closing. ABN states that it would have been

unreasonable to include this same information for each of the 149 real estate parcels involved in

the Complaint. ABN states that, contrary to Wells' assertion, its Complaint specifies a "start"

date for the alleged fraud and contains sufficient detail surrounding when the fraud occurred.

A review of the fraud claims in the Complaint reveals that the claims are very broad and

lacking in specificity. While the general outline of the alleged fraudulent scheme is set forth in

the complaint, it reads more like a newspaper article than a legal document. For example,

Paragraph 110 states that Wells misrepresented the "condition of the Properties". This is way

too vague, especially considering that there are 149 properties in this lawsuit. ABN needs to at

least generally categorize the misrepresentations that were made with respect to the condition of

the properties, such as decaying foundations, leaky roofs, inadequate plumbing, etc. Likewise,

the other alleged misrepresentations must be set forth in more detail. Admittedly this may lead to

a very long and detailed Complaint, but the Complaint contains very serious allegations

pertaining to numerous transactions and more detail is certainly warranted. The law provides

that the defendants are entitled to notice as to specifically what misrepresentations they are

alleged to have uttered (and when), and the Complaint as currently worded fails to inform the

defendants of the substance or timing of the alleged misrepresentations. Thus, the court will

dismiss the fraud count (Count II) with respect to defendant Wells.

Wells next argues that, even if Count II was not dismissed for lack of particularity, ABN has failed to state a cause of action for fraud as a matter of substantive law.  Under Indiana law, the elements of actual fraud are:

1.    A material misrepresentation of past or existing fact by the party to be charged which
2.    was false,
3.    was made with knowledge or in reckless ignorance of the falsity,
4.    was relied upon by the complaining party, and
5.    proximately caused the complaining party injury.

Darst v.  Illinois Farmers Ins.  Co., 716 N.E.2d 579, 581 (Ind.  Ct.  App.  1999).  "Mere expressions of opinion cannot be the basis of an action in fraud."  Block v.  Lake Mortgage Co., Inc., 601 N.E.2d 449, 451 (Ind.  Ct.  App.  1992).  Furthermore, fraud cannot be premised on representations that "relate to future, as opposed to past or existing, facts."  Anderson v. Indianapolis, Indiana AAMCO Dealers Advertising Pool, 678 N.E.2d 832, 837 (Ind.  Ct.  App. 1997).

The reliance element of a fraud claim is made up of "two distinct parts: the fact of reliance and the right of reliance."  Plymale v.  Upright, 419 N.E.2d 756, 761 (Ind.  Ct.  App. 1981).

The right of reliance is . . . tightly bound up with the duty of a representee to be diligent in safeguarding its interests.  The legal obligation that a person exercise the common sense and judgment of which he is possessed is a practical limitation on the actionability of various representations.  In the course of daily interactions and business dealings the average person encounters a barrage of opinions, advice, advertisements, estimates, and even "guesstimates."  He simply cannot believe, or rely upon, everything he is told.  The design of the law is to protect the weak and credulous from the wiles and stratagems of the artful and

8

> cunning, as well as those whose vigilance and sagacity enable
> them to protect themselves.  However, it is also settled that where
> persons stand mentally on equal footing and there is no fiduciary
> relation, the law will not protect one who fails to exercise common
> sense and judgment.

Id. at 762.  Thus, Indiana law "clearly allow[s] the courts, when confronted with representations

which are simply not the stuff that fraud is made of, to find as a matter of law either that the

representations are not actionable or that the plaintiff[] had no right to rely as a matter of law."

Id. at 763.

Wells argues that allegedly fraudulent statements made to a third-party other than the

plaintiff cannot give rise to a claim for fraud.  Wells points out that ABN's Complaint makes no

allegation that Wells made false statements to ABN.  Instead, the Complaint alleges that Wells

made a variety of misrepresentations to the Nulls and to Brogren.  (See Complaint at ¶¶ 70, 71,

110).  The Complaint then alleges that the Nulls and Brogren "predictably relayed these material

representations" to ABN (Complaint at ¶ 111).  Wells claims that as a matter of law, these

allegations provide an insufficient basis for a fraud claim against Wells by ABN.

In support of his argument, Wells relies on Lycan v.  Walters, 904 F.  Supp  884, 897

(S.D. Ind.  1995).  Lycan arose out of a complex investment project that failed.  Investors who

lost money in the project brought suit under a variety of theories against a variety of defendants.

The idea behind the investment project was to acquire the assets of a bankrupt company known

as "Prime Battery Manufacturing Company" and to put those assets to work in a new

manufacturing entity.  A company known as "Prime Corporation" was incorporated for the

purpose of purchasing the assets of Prime Battery out of bankruptcy.  Id.  at 890.  As part of the

transaction, it was contemplated that Prime Corporation would merge with a California

9

corporation known as "Rally Ventures, Ltd." and that the stock of the Prime Corporation would

then be used to acquire the assets of Prime Battery.  Id.  To memorialize this arrangement, Rally

Ventures (and related defendants, collectively referred to as the "Rally Defendants") entered into

a letter of intent with Prime Corporation.

The plaintiffs in Lycan were investors in Prime Corporation.  The evidence was

undisputed that there had never been "any direct personal contact or written communication

between the Rally defendants and the plaintiffs."  Id. at 897.  Instead, the plaintiffs relied on

alleged misrepresentations made by the Rally group in the letter of intent.  The court concluded

that the plaintiffs' attempt to base their fraud claim on the letter was "misplaced."  Id.  The court

noted that "the letter was addressed to Prime Corporation . . . not to [the plaintiffs].  Simply

stated, the plaintiffs cannot premise their fraud claim on statements that were not made to them."

Id.

In response, ABN points out that in Lycan, unlike in the present case, there were never

any misrepresentations made to the plaintiffs by anyone.  The plaintiffs relied entirely upon

statements made by the defendants in a Letter of Intent to a third party.  Accordingly, the court

found that the plaintiffs could not have been defrauded because they were not on the receiving

end of any fraudulent communications.  Id. at 897.  ABN claims that, unlike the plaintiff in

Lycan, ABN has alleged that it was on the receiving end of numerous misrepresentations.  That

is, ABN has alleged that Wells made material misrepresentations to the Nulls and to Brogren

intending that those misrepresentations be relayed to ABN.  ABN argues that additional

misrepresentations were made by the other fraudulent actors in the scheme that Wells directed

and controlled, and that Wells was the "mastermind" of the enterprise.  ABN contends that

10

whether directly or indirectly, Wells, individually and as a part of the enterprise, did provide
ABN with misinformation and made false representations of material fact to ABN.

ABN further argues that even if Wells was correct in his assertion that he made no
misrepresentation to ABN, this assertion would be immaterial.  ABN argues that under Indiana
law, it is not necessary for Wells to have made direct misrepresentations to ABN in order to be
liable for fraud.  The Indiana Court of Appeals has held that "[a]ll who knowingly enter a
fraudulent scheme become liable for the harm caused by the scheme - even if their part of the
scheme does not entail making fraudulent representations."  Schmidt Enterprises, Inc.  v.  State,
354 N.E.2d 247, 253 (Ind.  Ct.  App.  1976).  Thus, ABN claims that its allegations that Wells
"masterminded and profited" from the fraudulent scheme provide a sufficient basis for holding
Wells liable for the misrepresentations of those he directed.

ABN relies on White v.  Kenneth Warren & Son, Ltd., 2000 WL 91920 (N.D. Ill.  Jan.
14, 2000), to support its position.  In White, the plaintiffs, who were executors of an estate,
alleged a fraudulent scheme whereby the defendants were allowed to buy the estate's property at
a substantial discount.  The defendants argued that the complaint failed to allege fraud against
them with sufficient particularity because there were no allegations concerning specific
representations made by either of the moving defendants.  The district court held that the
defendants' argument was irrelevant because Illinois law recognizes the potential culpability of
defendants who are alleged to have knowingly received the fruits of a fraudulent scheme.  Id.  at
*7.  The court explained that the plaintiffs do not have to plead specific misrepresentations by
the defendants, rather, they must plead that at least one participant in the scheme made
actionable statements.  Id.

Wells, in reply, again cites to <u>Lycan</u>, and reiterates its position that ABN cannot premise its fraud claim against Wells on statements which were not made to ABN by Wells.  However, Wells concedes that ABN has adequately alleged the existence of fraudulent statements made by some defendants other than Wells, including, for example, Justin Stuckey and/or Maximum Mortgage.  Wells further concedes that ABN has alleged that Wells conspired with Stuckey and/or Maximum to defraud ABN.  Thus, as noted earlier, Wells also concedes that ABN has pled a cause of action for damages based on civil conspiracy.  (Wells' Reply Brief at 3, 7).  Nevertheless, Wells argues that even if he could be held liable for the fraud of another based on a civil conspiracy theory, he cannot be liable for fraud to ABN based on the allegations in the Complaint, and thus the allegations of fraud should be dismissed.

This court agrees with Wells that if there are no allegations that he made a misrepresentation to ABN, then he cannot be held liable for fraud, as a matter of law.  Therefore, the fraud claim against Wells will be dismissed for this additional reason. However, as held in <u>Schmidt</u> and <u>White</u>, a claim for civil conspiracy to commit fraud remains actionable even in the absence of a direct communication between Wells and ABN.  Thus, as conceded by Wells, the civil conspiracy claims remain in this case.

Wells next argues the fraud claim should be dismissed for the further reason that some of the allegations do not pertain to "misrepresentations of past or existing facts".  That is, Wells claims that certain of the allegations are premised on alleged misstatements of opinion or future events.  The Complaint, at Paragraph 110, alleges that Wells knowingly misrepresented: (1) the condition of the properties; (2) the likely appraisal value of the properties; (3) the actual appraised value of the properties; (4) the current profitability of the properties; (5) the feasibility

of increasing the rental income from the properties; (6) the likelihood of selling the properties to the current tenants; and (7) the amount of maintenance required in relation to the properties.

Wells admits that the alleged misrepresentations relating to (1) the condition of the properties, (3) the actual appraised value of the properties; and (4) the current profitability of the properties pertain to existing or past facts, although Wells claims that a phony appraisal is not actionable as a matter of law.

ABN does not appear to contest Wells' assertion that allegations (2), (5), (6) and (7) do not state actionable claims of fraud.  As these allegations relate to future events, the court finds as a matter of law that they fail to state a claim for fraud.

With respect to allegation (3), relating to the actual appraised value of the property, Wells claims that according to <u>Block v.  Lake Mortgage Co., Inc.</u>, 601 N.E.2d 449, 451 (Ind.  Ct.  App.  1992), it is well established under Indiana law that an appraisal is a matter of opinion, and is not actionable under a theory of fraud.  Wells also claims that ABN could not justifiably rely on the appraisal, because the appraisal is essentially an opinion statement by the seller of the real estate, and for ABN to rely upon the statement would amount to a failure of ABN to be diligent in safeguarding its interests, as required by law.

ABN strongly takes issue with Well's position that an appraisal can never form the basis of actionable fraud because it is a statement of opinion.  ABN cites to <u>Fleetwood Corp.  v.  Mirich</u>, 404 N.E.2d 38, 44 (Ind.Ct.  App.  1980), which held:

> [A]n expression of opinion may amount to fraud where it is a mere contrivance of fraud, or if the person to whom it was expressed has justly relied upon it and has been misled, or when it is coupled with other circumstances.
>
> Where a party represents a material fact to be true to his personal

13

knowledge, as distinguished from belief or opinion, when he does
not know whether it is true or not, and it is actually untrue, he is
guilty of falsehood, even if he believes it to be true; and if the
statement is thus made with the intention that it shall be acted upon
by another, who does so act upon it to his injury, the result is
actionable fraud.

ABN argues that <u>Fleetwood</u> is directly applicable.  ABN claims that the allegedly

fraudulent appraisals prepared by Chevalier and submitted to ABN by Maximum Mortgage and

Wells are precisely the kind of "contrivances of fraud" that were "coupled with other

circumstances" that constitute fraud.  ABN contends that, at Wells' direction, Chevalier prepared

and Maximum Mortgage knowingly provided ABN with bad faith appraisals (among other

things) to induce ABN to finance and then overfinance real estate transactions.  ABN maintains

that their misrepresentations were not an "honest" difference of opinion with respect to property

value.  ABN states that it is not the mere difference in opinion in appraised property value that

serves as the basis for ABN's fraud claim, but rather Wells' and Maximum Mortgage's

misrepresentation regarding the validity of the appraisals.  ABN claims that Wells, Maximum

Mortgage and Chevalier misrepresented the legitimacy of the appraisals to ABN and thus, the

fraudulent appraisals may serve as the basis of ABN's fraud claim.

ABN points out that other courts have held that false real estate appraisals can serve as a

basis for fraud.  For example, the district court in <u>Superior Bank, F.S.B. v.  Tandem Nat.'s</u>

<u>Mortgage, Inc.</u>, 179 F.  Supp.  2d 298 (D.  Md.  2000), rejected a defendant's motion to dismiss a

plaintiff's fraud claim that was based upon allegedly inflated appraisals.  <u>Id</u>.  at 311-13.  The

court reasoned that the appraisals were not mere statements of opinion and reasoned that "the

essence of the transactions at issue are those in which an honest appraisal, a best professional

estimate of value, would be provided and not, as alleged, a fraudulent or negligent statement."

14

Id. at 311-12.  In denying the motion to dismiss, the court held:

> Superior alleges that each of the appraisals involved in the case at bar contained falsely inflated prices and that it reasonably relied on the appraisals.  It may very well be that, at a later stage of the case, Superior will be unable to prove that the appraisals constitute false representations of fact as opposed to mere opinions and/or that its reliance was reasonable.  For purposes of the instant motion, however, the Court must accept all well pleaded allegations as true.  Applying that standard, the Court cannot conclude beyond doubt that Superior can prove no set of facts which would entitle it to relief based on the allegedly false appraisals.

Id. at 312; see also Olney Savings & Loan Assn. v. Trinity Banc Savings Assn., 855 F.2d 266,

273 (5th Cir. 1989)(holding that because a real estate appraisal may include certain opinions did

not preclude a finding of fraud based upon misrepresentations that townhouse appraisals were

accurate); 26 Williston on Contracts § 69:8 (4th ed. 2004)("a professional appraiser is assumed

to have superior knowledge regarding the valuation of property, and may be held liable for an

opinion respecting value when the appraisal is intentionally inaccurate and made to induce a

buyer or lender to enter into a transaction. . . .").

ABN argues that based on these principles, it has stated a cognizable claim for fraud,

which is based (in part) upon the false real estate appraisals.  ABN argues that to find otherwise

would mean that a real estate appraiser could state anything in an appraisal and escape liability.

With respect to Wells' argument that ABN had no right to rely on the appraisals, ABN

contends that Wells' argument addresses the merits of ABN's claims and not the sufficiency of

the allegations.  ABN states that its reliance is a question of fact to be determined by a trier of

fact.  See Fire Insurance Exchange v. Bell, 643 N.E.2d 310, 312 (Ind. 1994)(finding on

summary judgment that whether defendant had the right to rely upon alleged misrepresentations

was a question of fact for the jury to decide).

15

This court agrees with ABN on these issues and holds that an appraisal may be the basis of a fraud claim (providing that the claim is otherwise properly pled).  Additionally, it is clear that whether ABN reasonably relied on the appraisal is a question of fact.

RICO CLAIMS - COUNT XI

Next, Wells argues that ABN has failed to state a claim under the Racketeering Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1961 et seq..  RICO's civil liability provision, 18 U.S.C. § 1964, imposes civil liability upon those who engage in certain "prohibited activities" which are set forth in 18 U.S.C. § 1962.  Wells argues that ABN's Complaint fails to specify which prohibited acts serve as the basis for the RICO claim, and fails to state a claim based on any prohibited act.

As Wells notes, each prohibited activity in RICO "include[s], as one necessary element, proof of a 'pattern of racketeering activity.'" H.J. Inc.  v.  Northwestern Bell Telephone Co., 109 S.Ct.  2893, 2897 (1989).  In order to establish a pattern of racketeering activity, it is necessary to show the existence of at least two predicate acts of racketeering activity.  18 U.S.C. § 1961(5).  The acts which can serve as predicates are set forth in 18 U.S.C. § 1961(1), and include mail fraud, wire fraud and bank fraud, as those crimes are defined by 18 U.S.C. §§ 1341, 1343 and 1344.  Another necessary element of a RICO claim, regardless of which sort of prohibited act is alleged, is the existence of an enterprise.  18 U.S.C. § 1962(a)(b) & (c); Confederate Memorial Assoc, Inc. v.  Hines, 995 F.2d 295, 299 (D.D.C. 1993).

Wells contends that the same lack of particularity found in ABN's claim for common law fraud is similarly fatal to its RICO fraud claims.  Slaney v.  International Amateur Athletic

Federation, 244 F.3d 580, 597 (7th Cir.  2001)(allegations of fraud in a civil RICO complaint are subject to the particularity requirements of FRCP 9(b)).  Wells further contends that with respect to RICO claims based on mail fraud or wire fraud, the complaint "must sketch out who (i.e. which defendants) caused what to be mailed [or used the telephone] when, and how the mailing [or phone call] furthered the fraudulent scheme."  Shiman v.  Paridigm Venture, LLC, 2002 WL 1793570 at *2 (N.D. Ill.  2002).  Wells argues that ABN's Complaint makes no attempt to provide any particularity as to the use of the wires or the mail and, thus, the RICO claim is insufficiently specific.

ABN's RICO count in its Complaint (Count XI) states in part:

> 168.    Wells, Maximum Mortgage, Chevalier, Rollins, AC Appraisal, Appraisal Source, and Accelerated Title each conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

> 169.    Such racketeering activity also included the illegal submission by mail and/or wire of false and/or fraudulent documentation.

ABN simply states that "ABN's fraud allegations are sufficient under Rule 9(b); therefore, these allegations may serve as predicate acts for a RICO claim."   However, as detailed above, this court has held that ABN's fraud allegations are not sufficient under Rule 9(b).  Therefore those fraud allegations cannot form the basis of a RICO claim.  Additionally, the allegations in the RICO count, which are set forth above, fail to allege any details pertaining to the illegal use of the mail or wires and how such use furthered the fraudulent scheme.  As stated in Slaney, supra:

> Accordingly, a RICO plaintiff must, as a minimum, describe the two predicate acts of fraud with some specificity and state the time, place and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identity of the parties to those representations.

17

Thus, Wells is clearly correct that ABN has failed to plead its RICO claim with particularity and such claim must be dismissed.

Wells further argues that ABN's RICO claim fails as a matter of substantive law.  First, Wells argues that ABN has failed to properly plead the existence of an enterprise.  Under Seventh Circuit precedent, a RICO complaint must identify the enterprise alleged to be conducting racketeering activity.  Stachon v.  United Consumers Club, Inc., 229 F.3d 673, 676 (7th Cir.  2000).  A RICO enterprise can be formal or informal, but some type of organizational structure is required.  Id.  A RICO enterprise must have "an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision making."  Id.  (internal quotation omitted).  Furthermore, a RICO enterprise is "more than a group of people who get together to commit a pattern of racketeering activity."  Id (quotations omitted).  As such, "there must be an organization with structure and goals separate from the predicate acts themselves."  Id.

In Stachon, the defendants were alleged to have formed an enterprise which, through a pattern of racketeering activity predicated on mail fraud and wire fraud, carried out a scheme to defraud consumers.  The defendants operated a "buyers club."  The club attempted to attract members by representing that the club, through the use of mass buying power, could acquire top rate consumer goods at wholesale prices and pass these low costs along to club members.  In fact, the plaintiffs alleged that the products offered by the club were of inferior quality and were not priced as promised.  The Court concluded that the plaintiffs had failed to show that the actions complained of were "the work of an organization, however loose knit."  Id.  at 676.

The Seventh Circuit wrote that the most the plaintiffs might be able to establish is "a

pattern of racketeering activity through the purported scheme to defraud consumers." Id.

However, in order to withstand a motion to dismiss, the plaintiffs were required to

> present something more than this and assertions of conspiracy;
> otherwise, every conspiracy to commit fraud that requires more
> than one person to commit is a RICO organization and
> consequently every fraud that requires more than one person to
> commit is a RICO violation.  From [prior precedent] we know this
> is not the law.

Id. (internal citations and quotations omitted).  The Seventh Circuit emphasized that "RICO

plaintiffs cannot establish structure by defining the enterprise through what it supposedly does."

Id.  The Court also indicated that the complaint failed to offer an "intelligible clue as to the scope

and duration of the enterprise itself."  Id.  Thus, the Court granted the motion to dismiss.

In the present case, Wells claims that the Complaint fails to adequately identify the

enterprise alleged to have carried out a pattern of racketeering activity.  Wells states that ABN

alleges the identity of many, but not all, of the participants in the alleged enterprise, and

identifies the scheme alleged to have been carried out.  However, according to Wells, the

Complaint fails to identify the organizational structure of the enterprise, nor is there any identity

of the goals, scope, or duration of the enterprise separate from the predicate acts alleged.  Wells

claims that the Complaint impermissibly seeks to define the enterprise solely with reference to

the scheme to defraud ABN.

In response, ABN states that at this early stage it does not know all the facts about the

inner-workings of Wells' enterprise.  ABN claims that it has sufficiently articulated the

enterprise's structure and the role played by each of its affiliates.  ABN points out that the

Complaint clearly identifies Wells as the ring leader of the enterprise when it refers to him as its

"mastermind" and the individual who "profited the most" from its existence.  (Complaint at ¶

19

80).  ABN claims that the Complaint also articulates how Wells directs each arm of the

enterprise (Wells' holding companies, the mortgage broker, the title company, and the appraiser)

and how each arm of the enterprise performs its role.  ABN contends that this is sufficient to

defeat a motion to dismiss.

It is clear, as Wells points out, that the Complaint in this case focuses solely on the

alleged scheme by which ABN claims to have suffered damages.  The Complaint says nothing

about scope, duration, or purpose of the alleged enterprise.  Nor does the Complaint make any

allegations regarding the role of the players in the enterprise, beyond their roles in the specific

transactions by which ABN claims to have been injured.  It is impossible to distinguish this case

from Stachon and, as in that case, the motion to dismiss the RICO claim for failing to plead the

existence of an enterprise must be granted.

Wells has also argued that the Complaint fails to allege the continuity needed to establish

a pattern of racketeering activity.  A RICO plaintiff cannot establish a pattern of racketeering

activity simply by alleging two predicate acts.  Rather, the plaintiff must establish a relationship

between the predicate acts "coupled with the threat of continued criminal activity."  McDonald

v. Schencker, 18 F.3d 491, 497 (7th Cir.  1995).

>   Continuity is both a closed- and open-end concept, referring either
>   to a closed period of repeated conduct, or past conduct that by its
>   nature projects in the future with the threat of repetition.  A
>   plaintiff may allege continuity over a closed period by proving a
>   series of related predicates extending over a substantial period of
>   time.  Yet, in many instances, a plaintiff cannot establish
>   continuity in this manner, perhaps because the acts occurred only
>   over a relatively shorter period of time.  In this situation, known as
>   an "open-ended" scheme, continuity may still be shown where the
>   predicate acts, by their very nature, pose a threat of repetition
>   extending indefinitely into the future, or as part of an ongoing
>   entity's regular way of doing business.

McDonald, at 497 (internal citations and quotations omitted)(emphasis in original).  The Seventh

Circuit uses a multi-factor test first enunciated in Morgan v. Bank of Waukegan, 804 F.2d 970

(7th Cir. 1986), to determine whether a closed-end pattern of racketeering has been established.

The factors include (1) the duration of the predicate acts, (2) the number and variety of the

predicate acts, (3) the number of victims, (4) the presence of separate schemes, and (5) the

inflictions of distinct injuries.  Taylor, Bean & Whitaker Mortgage Corp. v. Vincent Cebulak,

2004 WL 2106605 (N.D. Ill.) at * 10.  Duration is the "closest thing we have to a bright line

continuity test: the predicate acts must extend over a substantial period of time; a few weeks or

months is considered insubstantial." Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1024 (7th

Cir. 1992).

　　　　The final factor, "the infliction of distinct injuries" refers to "different types of injuries,

not multiple instances of the same injury." CIB Bank v. Esmail, 2004 WL 3119027 (N.D.

Ill.)(emphasis in original).  In CIB Bank, the plaintiff bank had made a large loan to fund a

construction project.  On ten different occasions, a defendant had submitted "owner draw

requests" to the bank to obtain funds to pay for materials and labor expended on the construction

project.  However, after receiving the bank's funds, the defendants did not pay the persons that

had provided the materials and labor, but instead "improperly used these funds for purposes

other than the construction" of the project being financed. Id. at *1.  The court held that the

plaintiff bank did not suffer different types of injury.  Rather, the court found that the plaintiff

"alleges ten repeated instances of the same fraudulent act, which, . . . are properly considered

only one distinct injury of improperly used loan funds." Id. at *6.

　　　　Wells contends that an application of the Morgan factors indicate that ABN has failed to

21

allege closed-end continuity.  Wells claims that one of the failings of the Complaint with regard
to the specificity of the allegations of fraud is that it fails to allege that the dates upon which the
allegedly fraudulent statements took place.  This is significant because the identification of the
dates of predicate acts is necessary to establish that the pattern of racketeering activity extended
over a substantial time.  "Although the Seventh Circuit has not established a per se duration
requirement, in Midwest it provided an expansive list of cases where a duration of less than two
years was insufficient to establish continuity under a closed-ended analysis."  Taylor, Bean &
Whitaker, at *9.  Wells argues that, given that ABN has failed to make any allegations as to the
duration of the scheme, it cannot be said that ABN has sufficiently alleged the requisite
substantial duration of the predicate acts.

Wells acknowledges that ABN does allege that a variety of defendants engaged in
predicate acts in a substantial number of transactions.  Therefore, Wells does not contend that the
second Morgan factor (the number and variety of predicate acts) weighs in favor of dismissal.
However, Wells argues that the remaining factors do militate against a finding of continuity.
First, ABN has identified only one victim, itself.  It has also alleged only one scheme, that is to
fraud ABN into making excessive loans.  See Taylor, Bean & Whitaker at *10 (mortgage
company which was allegedly fraudulently induced to make multiple mortgage loans alleged
only a single scheme).  Finally, Wells argues, ABN has not alleged distinct types of injuries.
Rather, it has alleged that it made bad loans on multiple occasions.  Wells contends that,
pursuant to CIB Bank, ABN is properly considered to have suffered only one distinct injury.
Wells concludes that ABN has failed to make any allegations regarding duration and only alleges
a single scheme with a single victim and a single distinct injury, and has thus failed to allege

22

sufficient closed-end continuity to establish a pattern of racketeering activity.

In response, ABN claims that Wells' "one victim" and "one scheme" arguments are not determinative.  ABN points out that the Seventh Circuit in <u>Morgan</u> held that "the mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement."  <u>Morgan</u>, 804 F.32d at 976. ABN further points out that the Seventh Circuit has held that "the repeated infliction of economic injury upon a single victim of a single scheme is sufficient to establish a pattern of racketeering activity for purposes of civil RICO."  <u>Liquid Air Corp.  v.  Rogers</u>, 834 F.2d 1297, 1304-05 (7th Cir.  1987)(citing <u>Sun Savings & Loan Ass'n v.  Dierdorff</u>, 825 F.2d 187 (9th Cir. 1987)("if a defendant commits two or more predicate acts that are not isolated events, are separate in time, and are in furtherance of a single criminal scheme, then RICO's pattern requirement is satisfied")); <u>Gagan v.  American Cablevision</u>, 77 F.3d 951, 963 (7th Cir.  1996).

In <u>Liquid Air</u>, the Seventh Circuit held:

> Therefore, we have a single scheme which lasted several months and defrauded a single victim.  The defendants committed nineteen separate acts, each resulting in use of the mails and use of the wire service.  Each time an invoice was falsely prepared, it deprived [Plaintiff] of its entitlement to rent or replacement value. Therefore, each act resulted in a distinct injury to [Plaintiff] and a concomitant benefit to [Defendant].  We find that the repeated infliction of economic injury upon a single victim of a single scheme is sufficient to establish a pattern of racketeering activity for purposes of civil RICO.

834 F.2d at 1304-05.   ABN argues that <u>Liquid Air</u> is compelling in this case.  ABN notes that the alleged enterprise in this matter fraudulently induced ABN to finance 149 loans.  The loans were not made in one large transaction, but in several independent transactions.  For example, the Nulls purchased groups of houses from Wells on at least four occasions.  ABN argues that

because each bad loan (or transaction) deprived ABN of a "specific amount of revenue" and "represented a discrete attempt to defraud [ABN], and had little to do with the previous or subsequent [fraudulent acts]," ABN has sufficiently alleged a pattern of racketeering activity. Uniroyal Goodrich Tire Co. v. Mutual Trading Corp., 63 F.3d 516, 524 (7th Cir. 1995).

ABN also disputes Wells' factual contentions that ABN has "identified only one victim" and "alleged only one scheme." ABN states that while it is the only plaintiff in this matter, the Complaint identifies at least four victims, as Wells' enterprise is alleged to have victimized both Brogren and the Nulls, the mortgagees. Brogren and the Nulls were originally interested in purchasing a few residential houses as personal investments, and were fraudulently induced to purchase 149 houses at severely inflated prices. ABN contends that the frauds perpetrated by Wells' enterprise saddled the three novice investors with virtually insurmountable debt, and thus the three mortgagees were victims of Wells' enterprise.

ABN maintains that Wells' assertion that all of the 149 fraudulent transactions constitute a single scheme is also wrong. ABN asserts that there were as many as 149 schemes (the number of fraudulent loans procured), possibly only 10 schemes (the approximate number of transactions), but no fewer than two schemes (the number of independent borrowers).

In reply, Wells notes that CIB Bank has clearly pointed out that Liquid Air predates the Supreme Court opinion in H.J., Inc. v. Northwestern Bell Telephone Co., 109 S.Ct. 2893 (1989) "in which the Supreme Court narrowed the RICO requirements and, thus . . . partially abrogated" Liquid Air.

Wells also reiterates its argument that the most important factor in the closed-end continuity analysis is the duration of the predicate acts. Midwest Grinding Co. v. Spitz, 976

F.2d 1016, 1024 (7th Cir. 1992). Wells states that on the question of duration, the real question

is the time period over which predicate acts occurred, and not the duration over which other

aspects of the scheme may have extended. See Midwest at 1024. ABN has indicated that the

alleged scheme had the duration of, at the most, six months. As Wells notes, this time period is

insufficient to establish closed-end continuity. The Seventh Circuit, in Midwest, extensively

listed cases where it found a duration of less than two years insufficient to establish continuity

under a closed-end analysis." Taylor, Bean & Whitaker Mortgage Corp. v. Vincent Cebulak,

2000 WL 3106605, *9 (N.D. Ill.). Wells argues that ABN has failed to identify a single Seventh

Circuit case that concludes that a duration of six months was sufficient to establish close-ended

continuity. In fact, the six months duration ABN claims to have alleged in its Complaint is even

less than the seventh month duration which was present in Liquid Air, a case which was decided

before the Supreme Court narrowed RICO's requirements. Wells thus concludes that by alleging

a scheme lasting, at most, six months, ABN has failed to allege a scheme of sufficient duration to

establish close-ended continuity.

　　Wells further argues that the majority of the remaining Morgan factors, and in particular

the factors relating to the number of victims, the presence of separate schemes, and the infliction

of distinct injuries also weigh in favor of dismissal. Wells notes that ABN claims that there were

possibly as many as 149 schemes, but points out that ABN's own characterization of the case

belies this claim. For example, in paragraph 80 of the Complaint, ABN states that "Wells

masterminded and profited the most from the scheme detailed above." (emphasis added).

　　Wells also notes that ABN does not deal directly with the proposition that the

"occurrence of distinct injuries is the occurrence of different types of injuries, not multiple

instances of the same injury."  CIB Bank, at *6.

Lastly, Wells argues that the final factor, the number of victims, also weighs in favor of dismissal.  With respect to ABN's argument that the Nulls and Brogren are victims of the alleged scheme, Wells contends that it is difficult to see how Brogren and the Nulls are properly described as victims in this case.  In its Complaint, ABN alleges that the Nulls and Brogren submitted loan applications containing misrepresentations that the purpose of the loans was to refinance the properties as opposed to actually purchasing the property.  ABN identifies these misrepresentations as the basis for its fraud claim against Justin Stuckey and Maximum Mortgage.  Wells argues that if the statements contained on the Nulls' and Brogren's loan applications are in fact fraudulent, then the Nulls and Brogren would apparently be guilty of making the same fraudulent statements allegedly made by Maximum Mortgage and Justin Stuckey.  Wells argues that under these circumstances, the Nulls and Brogren cannot be characterized as victims of the scheme.

This court holds that even if the RICO claims were not fatally deficient in other respects, the claims fail to allege sufficient duration to establish closed-end continuity.  Moreover, an analysis of the other Morgan factors (number of victims, separate schemes, distinct injuries) bolsters the conclusion that "closed-end continuity" has not been properly alleged in this case.

Wells next argues that the RICO claims fail because the Complaint fails to establish (in the alternative) open-ended continuity.  In H.J., Inc., the Supreme Court noted that "Congress was concerned in RICO with long term criminal conduct."  492 U.S. at 242.  It is for this reason that predicate acts must extend over a substantial period of time to establish closed-end continuity.  Id.  However, the Court also acknowledged that "[o]ften a RICO action will be

26

brought before continuity can be established by pointing to predicate acts extending over a substantial period of time." Id.  In these cases, liability depends on whether the threat of continuity is demonstrated." Id.

Thus, "[o]pen-ended continuity is that which establishes a pattern by showing past conduct that by its nature projects into the future with the threat of repetition." CIB Bank, at *4 (internal quotation omitted).  "Such a threat of continuity exists when a plaintiff shows (1) a specific threat of repetition; (2) that the predicate acts of offenses are part of an ongoing entity's regular way of doing business; or (3) that the defendant operates a long term association to exist for criminal purposes." Id.

Wells argues that the allegations in ABN's Complaint fail to establish open-ended continuity.  Wells points out that there is no allegation that predicate acts are part of any ongoing entity's regular way of doing business.  Nor are there allegations that any defendant operates a long term association which exists for criminal purposes.  Furthermore, as in the case of the close-ended analysis, ABN's failure to allege with particularity the dates upon which the allegedly fraudulent acts occurred weighs against a finding of open-ended continuity, especially since the Complaint contains no allegations of any recent fraudulent activity.  Wells cites to CIB Bank where the court noted that the last predicate act of illegal activity alleged in the complaint "occurred more than a year and a half ago. . . . This does not support a specific threat of repetition." CIB Bank, at *4.  Similarly, in Taylor, Bean & Whitaker, a mortgage fraud case, the complaint contained no "facts to suggest that defendants committed any fraudulent mortgaged transaction [in the approximately two years prior to] the date the complaint was filed." Taylor, Bean & Whitaker, at *10.  The court concluded that there were insufficient allegations of open-

ended continuity and dismissed the plaintiff's complaint. The court further noted that its conclusion was not altered by "conclusory and unparticularized allegations that defendants continued to engage in racketeering activity." Id.

Wells argues that ABN's complaint fails to establish the threat of future repetition of predicate acts alleged in the Complaint. Wells again notes that there is no allegation that the predicate acts are part of an ongoing entity's regular way of doing business or that any defendant operates a long term association existing for criminal purposes. Wells claims that, most significantly, there is no allegation that any defendant has engaged in any predicate act for a period of many months leading up to the filing of the Complaint. Wells argues that there is nothing in the Complaint suggesting the likelihood of repetition in the future. Wells concludes that the Complaint does not sufficiently allege facts to establish open-ended or closed-ended continuity, and thus fails to sufficiently allege a pattern of racketeering activity.

In response, ABN simply asserts that it has sufficiently alleged open-ended continuity. ABN notes that open-ended continuity is typically invoked when a RICO action is brought before close-ended continuity can be established, since "open-ended continuity may satisfy the continuity prong of the pattern requirement regardless of its brevity." Vicom, Inc. v. Harbridge Merchant Servs., 20 F.3d 771, 782 (7th Cir. 1994).

ABN states that, to the best of its knowledge, Wells and his holding companies and his enterprise in general engage in mail fraud, wire fraud and bank fraud as a regular way of conducting business. ABN notes that it has dealt with Wells' enterprise on 149 occasions and each and every one of them has been fraudulent. ABN argues that the 149 distinct acts of fraud at least suggest that Wells and his enterprise routinely and regularly conduct fraudulent business.

28

However, as Wells notes in reply, such "cursory and unparticularized allegations that Defendants continue to engage in racketeering activity" are insufficient to satisfy the open-ended continuity requirement.  <u>Taylor, Bean & Whitaker</u>, at \*10.  Thus, this court holds that ABN has failed to properly allege open-ended continuity, and its RICO claims fail for this additional reason.


<u>STATE LAW CLAIMS - COUNT IX AND COUNT X</u>

Wells next argues that ABN's Complaint fails to state an Indiana statutory claim with adequate particularity.  ABN labels Count IX of its Complaint "Defrauding a Financial Institution- State Law" and labels Count X "Deception".  ABN has not offered a statutory citation with respect to these counts.  Wells contends that ABN's allegations of bank fraud and deception are inadequate for the same reasons that ABN's allegations of common law fraud and RICO fraud are inadequate.  Wells argues that the Complaint fails to state the content of the alleged misrepresentation by Wells which caused injury to ABN.  The Complaint also fails to state when the representations were made.

The court will dismiss these two counts against Wells for the same reasons that the fraud claims in Count II were dismissed.


<u>TORTIOUS INTERFERENCE CLAIMS - COUNT VI</u>

Next, Wells claims that ABN's Complaint fails to allege a claim for tortious interference. Count VI of ABN's Complaint is labeled "Tortious Interference with Contractual/Business Relations".  In that count, ABN claims that Wells interfered with the relationship between ABN and Maximum Mortgage, the mortgage broker which brokered the Brogren and Null loans.

29

Count VI contains the following allegations:

> 142.   Prior to the events outlined herein, ABN used Maximum Mortgage as one of its mortgage brokers.  This relationship, embodied in the Lending Agreement, was lucrative for both ABN and Maximum Mortgage.

> 143.   Being skilled in the real estate investment business, Wells knew that as a mortgage broker it was essential that Maximum Mortgage had relationships with lenders.  Wells also knew that it was likely that a lender would ultimately fund the mortgages at issue.

> 144.   By enlisting Maximum Mortgage in his scheme, Wells induced Maximum Mortgage to violate the Lending Agreement and act against ABN's interests.

> 145.   Wells tortiously interfered with ABN's valid business and contractual relationship with Maximum Mortgage.

> 146.   As a result of Wells' tortuous [sic] interference, ABN has been damaged.

In order to state a claim for interference with contractual relations under Indiana law, a plaintiff "must allege the following elements: (1) the existence of a valid and enforceable contract; (2) a defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) resulting damages."  Chomer v. Logansport Memorial Hospital, 2003 WL 23009014, *4 (S.D. Ind.).  The elements for a cause of action for tortious interference with a business relationship are the same as the elements for interference with a contract, except that the existence of a valid relationship and the defendant's knowledge of the relationship are substituted for the existence of a valid contract and the defendant's knowledge of the contract.  See AutoXChange.com, Inc.  v.  Dreyer & Reinbold, Inc., 816 N.E.2d 40, 51 (Ind.Ct.App.  2004).  There is also an additional element that the defendant "acted illegally by his interference."  Furno v.  Citizens Ins.  Co.  of America, 590

N.E.2d 1137 (Ind.Ct.App. 1992).

Wells contends that Count VI does not allege that he knew of the existence of any

contract between ABN and Maximum Mortgage, nor does it allege that Wells was aware of the

existence of a business relationship between the two.  Wells further contends that, as it relates to

the business relationship claim, there is no allegation that Wells acted illegally by his

interference.

In response, ABN states that the Complaint alleges that Wells committed fraud and

deception and violated RICO, all of which constitute "illegal" activities.  Wells has conceded

that ABN has stated a claim for civil conspiracy to commit fraud, and thus concedes that the

tortious interference claim should not be dismissed for failure to allege illegal activities.  With

respect to Wells' argument that ABN has failed to allege knowledge of a business contract or

relationship between Maximum Mortgage and ABN, ABN relies on its Complaint at paragraphs

142 and 143.  Again, these paragraphs state:

> 142.    Prior to the events outlined herein, ABN used Maximum
> Mortgage as one of its mortgage brokers.  This relationship,
> embodied in the Lending Agreement, was lucrative for both ABN
> and Maximum Mortgage.
>
> 143.    Being skilled in the real estate investment business, Wells
> knew that as a mortgage broker it was essential that Maximum
> Mortgage had relationships with lenders.  Wells also knew that it
> was likely that a lender would ultimately fund the mortgages at
> issue.

ABN claims that these paragraphs adequately allege that Wells had knowledge of ABN's

contract or business relationship with Maximum Mortgage.  ABN contends that its allegations

satisfy the general pleading requirements of Rule 8.

However, as Wells points out in reply, there are no allegations in the complaint that

31

Wells had knowledge of the existence of a contract between Maximum Mortgage and ABN. Rather, the complaint alleges that Wells knew that Maximum Mortgage was a mortgage broker and that it had relationships with "lenders".   The court agrees that, for this reason, the claim for tortious interference with business relationship should be dismissed.

Conclusion

Based on the foregoing, the court GRANTS Wells' motion to dismiss, and dismisses the following claims with respect to defendants Rex Wells, Eilatan, Indiana Resource Network and Alliance Property Management: (1) the fraud claims in Count II, (2) the RICO claims in Count XI, (3) the state law claims in Count IX and Count X, and (4) the tortious interference claims in Count VI.

Entered: May16, 2005.

s/ William C.  Lee
William C. Lee, Judge
United States District Court