UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| ABN AMRO MORTGAGE GROUP, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL NO. 1:04cv492 |
| | ) |
| MAXIMUM MORTGAGE, INC., et al., | ) |
| | ) |
| Defendants. | ) |

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by defendant Carrie Stuckey ("Stuckey") on October 20, 2005. The plaintiff, ABN Amro Mortgage Group, Inc. ("ABN"), filed its response on June 5, 2006, to which Stuckey replied on July 5, 2006. ABN then filed a sur-reply on July 20, 2006.

Also before the court is a motion to strike filed by Stuckey on July 5, 2006. ABN responded to this motion on July 20, 2006, to which Stuckey replied on July 31, 2006. ABN filed its sur-reply on August 7, 2006.

For the following reasons, the motion for summary judgment and the motion to strike will both be denied.

Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©. However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir.

1990).  Rule 56© mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff."  Id.  In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir. 1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party."  Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

   Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, Celotex, 477 U.S. at 323.  The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment.  Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir. 1988); Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988); Posey v. Skyline

2

Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960 (1983).

So that the district court may readily determine whether genuine issues of material fact exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate citation to the record to which the moving party contends no genuine issues exist.  In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated.  See, Waldridge v. American Hoechst Corp. et al., 24 F.3d 918 (7th Cir. 1994).  In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511.  Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion.  L.R. 56.1

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248.  Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. Id.  The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e).  To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407, 1411 (7th Cir. 1988).  The non-moving party must come forward with

specific facts showing that there is a genuine issue for trial.  Id.  A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-252.  Finally, the court notes that, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate.  Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir. 1983).

## Discussion

This lawsuit involves a series of loan transactions whereby ABN provided financing for 149 separate parcels of real estate.  ABN believes it was the victim of a fraudulent scheme whereby Maximum Mortgage, Inc. ("Maximum Mortgage") and others induced ABN to finance the 149 properties through the submission of inaccurate, incorrect, and false information.  ABN contends that at all times relevant to this lawsuit, Stuckey served as an officer of Maximum Mortgage.  ABN claims that Stuckey assisted in, and to some degree supervised, the collection and verification of information submitted to ABN for some of the loans at issue.

ABN has asserted claims of breach of contract, fraud, constructive fraud, civil conspiracy, defrauding a financial institution, deception, and criminal mischief against Maximum Mortgage for its role in fraudulently inducing ABN to fund the loans at issue.  ABN has specifically asserted a claim against Carrie Stuckey to impose personal liability for her involvement in the loan transactions as an officer of Maximum Mortgage.

In support of her motion for summary judgment, Stuckey argues that she was not involved in any tortious act and cannot be held liable to ABN merely because she was a

4

corporate officer. Stuckey states that she was not an owner of any shares or other interests in Maximum Mortgage, and that she committed no acts as an officer of Maximum Mortgage that would make her liable to the plaintiff.

Stuckey argues that, in Indiana, a party must have been personally involved in the tortious act for liability to attach. See e.g., Bowling v. Holdeman, 413 N.E.2d 1010 (Ind. App. 1980); Roake v. Christensen, 528 N.E.2d 789, 792 (Ind. App. 1988). Stuckey contends that ABN is attempting to pierce the corporate veil, and that ABN has failed to set forth any facts that would permit the corporate veil to be pierced.

In response to the motion for summary judgment, ABN argues that there are questions of fact surrounding the extent of Stuckey's knowledge of and participation in the allegedly fraudulent scheme. ABN then sets forth the following statement of genuine issues, which are supported by the affidavit of Lorie Miller and the deposition and affidavit of Carrie Stuckey.

ABN buys loans from mortgage brokers across the country. The brokers are agents of the mortgage borrowers, and assist the borrowers in obtaining a loan. A broker's obligation is to gather all of the information required by ABN. The broker then offers to sell the loan to ABN.

In 2002, over the course of several months, James Rickie Null, James Ryan Null, and Leif Brogren obtained financing from ABN on a total of 149 properties. The financing was provided through a series of separate loan transactions. Maximum Mortgage served as the mortgage broker and originator for all 149 loans. As the mortgage broker and loan originator, Maximum Mortgage generated loan applications on behalf of the Nulls and Brogren and submitted them to ABN. As Carrie Stuckey states in her affidavit, Maximum Mortgage owed ABN a duty to follow-up and verify the information submitted in the loan applications to ensure

5

accuracy.  ABN relied upon Maximum Mortgage to verify the information originally submitted in the loan applications.  ABN claims that if Maximum Mortgage found that inaccurate information had been submitted to obtain approval from ABN, Maximum Mortgage had a duty to correct the deficiencies and obtain a new approval.

The loan applications submitted by Maximum Mortgage stated that the purpose of each of the loans was to refinance the real estate described in the loan application.  According to the Miller affidavit, however, the true purpose of each loan appears to have been to finance the original acquisition of each of the properties.  The affidavit also states that the loan applications submitted to ABN also appear to contain false information concerning the year the Nulls and Brogren acquired each of the properties, in addition to the amount the Nulls and Brogren paid to acquire each of the properties.  Additionally, the Miller affidavit states that the loan applications further appear to contain false information concerning rental income being generated by the Nulls and Brogren.

Stuckey has filed a motion to strike the Miller affidavit. Stuckey argues, in general, that the Miller affidavit fails to show any nexus between Stuckey and the alleged wrongs. Stuckey further argues, more specifically, that paragraphs 7, 11, 13, 14 and 15 of the Miller affidavit should be disregarded because they contain inadmissible hearsay, are conclusory in nature, and are not supported by personal knowledge.  Paragraph 7 reads, in its entirety, as follows:

> As the mortgage broker and loan originator for the 149 loans, Maximum Mortgage generated loan applications on behalf of the Nulls and Brogren and submitted them to ABN.  The loan applications submitted by Maximum Mortgage stated that the purpose of each of the loans was to refinance the real estate described in the loan application.  However, the true purpose of

>each loan appears to have been to finance the original acquisition of each of the properties.  The loan applications submitted to ABN also appear to contain false information concerning the year the Nulls and Brogren acquired each of the properties, in addition to the amount the Nulls and Brogren paid to acquire each of the properties.  The loan applications further appear to contain false information concerning rental income being generated by the Nulls and Brogren.

Stuckey specifically challenges the last three sentences of this paragraph, where Miller testifies as to what appears to have been the true purpose, acquisition year, and rental income for the properties described in the loan applications.  Stuckey contends that these statements are conclusory and constitute no more than unsupported suspicion and argumentation without a foundation in the record.  Stuckey further contends that Miller inappropriately "opines about apparent false information" in this paragraph.

In response to Stuckey's contentions, ABN states that its lawsuit is based upon allegedly false information submitted to ABN by various parties, including Stuckey and her employer, Maximum Mortgage.  Attached to Miller's affidavit and ABN's complaint are documents containing some of the false information provided to ABN.  ABN argues that Miller's affidavit merely authenticates the referenced documents and identifies how the documents submitted by Maximum Mortgage are both internally inconsistent and inconsistent with public records contained in ABN's files.  ABN maintains that this is entirely appropriate.  "A witness may give opinions when they are based on or inferred from his own observations."  Westchester Fire Ins. Co. v. American Wood Fibers, Inc., 2006 U.S. Dist. LEXIS 24225, *11 (N.D. Ind. 2006).  ABN further points out that personal knowledge can include inferences and opinions of an affiant so long as those inferences are substantiated by specific facts.  Fulmore v. Home Depot, U.S.A., Inc., 423 F. Supp. 2d 861, 871 (S.D. Ind. 2006).

In reply, Stuckey again contends that Miller's affidavit contains inadmissible opinions regarding the true purpose of, or false information contained in, the loan applications submitted by Maximum Mortgage. Specifically, Stuckey appears to be attacking Miller's testimony that various information provided by Maximum Mortgage appears to be false. Stuckey seems to argue that the Court should not infer that Miller has made the observations necessary to render her "opinion" (that Maximum Mortgage submitted false information) based on the mere fact that she is employed by ABN.

In its sur-reply, ABN points out that the Miller affidavit discusses information contained in ABN's loan files, including information attached to her affidavit. The attached documentation relates to one of the particular loans at issue (4405 Monroe). Miller simply authenticates the attached documents and, based on her observation of inconsistencies in such documentation, infers that false information was supplied by Maximum Mortgage. ABN correctly argues that such inference is entirely appropriate. It cannot be disputed that Miller has seen the documents attached to her affidavit. Thus, inferences based on her review of those documents are clearly within her "sphere of observation". Anyone reviewing the documents could presumably make the same observations and inferences as Miller. Moreover, the inferences made by Miller are not even the most critical aspect of her testimony. What is more important is that Miller authenticates the relevant documents to properly place them before the Court. ABN notes that Stuckey does not challenge the authenticity of the documents.

Federal Rule of Evidence 901 requires that prior to admission of a document there be sufficient evidence to support a finding that the document is what its proponent claims. Fed.R.Evid. 901; <u>LDI Corporation v. Investor Group Leasing LTD.</u>, 1997 WL 733891, *6 (N.D.

Ill. 1997). Section (b) of Rule 901 gives numerous illustrations of how authenticity may be established, including: (1) the testimony of a witness with knowledge that the matter is what it is claimed to be; and (2) appearance, contents, substance, internal pattern, or other distinctive characteristics taken in conjunction with other circumstances. Fed.R.Evid. 901(b); <u>LDI Corporation</u>, 1997 WL 733891 at *6. In other words, any and all manner of circumstantial evidence may be used to establish that the document is genuine. <u>Id</u>. It is clear that Miller had laid a sufficient foundation as to her ability to authenticate the documents. Miller specifically testifies that, in her capacity as an ABN employee, she is familiar with the records referenced in her affidavit. (Miller Aff. at ¶ 12). Moreover, Stuckey has offered no explanation as to why the authenticity of the attached documents should be questioned. This court agrees with ABN that the attached documentation, and Miller's testimony with respect thereto, is admissible. Accordingly, paragraph 7 will not be stricken.

With respect to paragraph 11 of Miller's affidavit, Stuckey challenges the testimony as constituting inadmissible hearsay and being conclusory. Paragraph 11 of Miller's affidavit reads as follows:

> Many of the 149 loan applications submitted by Maximum Mortgage contain deficiencies and apparently false or inaccurate information similar to that found in the loan application for 4405 Monroe.

ABN first notes that Stuckey has failed to provide any explanation of how the cited testimony constitutes hearsay. ABN points out that Miller is not relying on an out-of-court statement for the truth of the matter asserted. <u>See</u> Fed.R.Evid. 801. Rather, Miller is simply relaying to the Court her observations based upon her review and familiarity with ABN's records. Moreover, the documents upon which Miller relies clearly fall within either the business record or public

records exception to the hearsay rule.  See Fed.R.Evid. 803(6), (8).  In paragraph 2 of her affidavit. Miller explicitly verifies that her testimony is based upon either her own personal knowledge or personal knowledge gained "through review of ABN's business records, which are kept in the ordinary course of business and created at or near the time of the events documented therein."   Stuckey's argument that the testimony in paragraph 11 is conclusory fails for the same reasons articulated in connection with paragraph 7.  Miller's "conclusions" are based upon her own observations and are substantiated by specific facts and records.

      Although Stuckey does not challenge the authenticity of the documents attached to the Miller affidavit, Stuckey contends that "ABN has failed through Lorie Miller's affidavit to place permissibly before this Court any documents attached to or referenced by her affidavit."  In this regard, Stuckey argues that ABN has failed to sufficiently establish that the documents constitute business records under Fed.R.Evid. 803(6), an exception to the hearsay rule.  However, as ABN points out, Stuckey fails to explain why Rule 803(6) is needed.

      In her original brief, Stuckey made vague and general allegations of hearsay, with no meaningful explanation as to which statements constituted hearsay or why.  Stuckey's reply brief again fails to explain how Miller's testimony, or the documents attached to her affidavit, constitute hearsay. Rather, Stuckey simply assumes that the attached documents constitute hearsay, and argues that Rule 803(6) does not apply.

      Federal Rule of Evidence 801(c) defines hearsay as: "a statement, other than one made by the declarant ... offered in evidence to prove the truth of the matter asserted."  ABN argues that the documents attached to the Miller affidavit are not hearsay because they are not being offered to prove the truth of what they assert.  Rather, the loan applications submitted to ABN by

10

Maximum Mortgage, and Miller's testimony relating thereto, is actually offered to show that Maximum Mortgage's statements were false.  ABN states that the documents and testimony provided by Miller are simply being offered to prove that the information provided by Maximum Mortgage is inconsistent with other information in ABN's files.  ABN argues that this creates, at the very least, an issue of fact with respect to whether Maximum Mortgage submitted false and inaccurate information.  Furthermore, as ABN notes, Maximum Mortgage's own statements in the loan applications are statements of a party-opponent.  Thus, to the extent such statements are being offered against Maximum Mortgage (or Stuckey as an agent thereof), they do not constitute hearsay.  See Fed.R.Evid. 801(d).  Therefore, paragraph 11 will not be stricken.

Stuckey challenges paragraph 13 of the Miller affidavit as being conclusory, not based on personal knowledge, and constituting inadmissible hearsay.  Paragraph 13 of Miller's affidavit reads as follows:

> Maximum Mortgage failed to disclose and/or correct the inaccurate, incorrect, incomplete, false, and/or fraudulent information used to obtain the loans from ABN, as it was under a duty to do.

With respect to her hearsay argument, Stuckey again fails to provide any explanation of how Miller's testimony constitutes hearsay.  For the same reasons as discussed in connection with paragraph 11 of the affidavit, Miller's statement does not constitute hearsay.  Miller is simply reporting her own observations and inferences based on her knowledge of and familiarity with ABN's business records.  Moreover, the information contained in ABN's business records is protected by the business record and/or public records exception to the hearsay rule.

With respect to Stuckey's contention that the testimony in paragraph 13 in conclusory, ABN states that whether Maximum Mortgage failed to disclose or correct inaccurate information

is a hard fact.  Either Maximum Mortgage did correct such inaccuracies, or it did not.  Thus, ABN argues that Miller's testimony that Maximum Mortgage did not correct the inaccurate and false information does not constitute an inappropriate conclusion.  With respect to Miller's testimony that Maximum Mortgage was under a duty to correct the inaccurate information, ABN contends that this testimony is no longer necessary because Stuckey has admitted the existence of such a duty in her own deposition.

With respect to Stuckey's claim that Miller has failed to establish her personal knowledge of the underlying testimony, ABN points out that in paragraph 2 of her affidavit, Miller explicitly swore and verified that her testimony is based upon her personal knowledge and upon her familiarity with ABN's business records.  Additionally, as an employee and corporate representative of ABN, it can be inferred that Miller is familiar with the matters to which she attests.  See Westchester, 2006 U.S. Dist. LEXIS 24225 at *11 (presuming knowledge of events described in affidavit based on employment and position with company).  Thus, paragraph 13 will not be stricken.

Stuckey challenges paragraph 14 of Miller's affidavit as being speculative and conclusory and because Miller allegedly failed to establish her personal knowledge of the asserted facts.  Paragraph 14 of Miller's affidavit states as follows:

> ABN would not have funded the loans had it been aware prior to closing of the false and inaccurate information contained in the loan applications.

ABN argues that Miller's express attestation to having personal knowledge, combined with her status as an ABN employee and corporate representative, demonstrate that she has sufficient knowledge of "what ABN would have done under the circumstances."  It is a fact that a

12

corporation has no mouth with which to speak other than that of its representatives.  Whether ABN would or would not have funded the loans is undoubtedly a matter upon which ABN's representatives can appropriately testify.  Therefore, paragraph 14 will not be stricken.

Lastly, Stuckey challenges paragraph 15 of Miller's affidavit as being inappropriately conclusory.  Paragraph 15 states as follows:

> The Nulls and Brogren have defaulted on all 149 loans with ABN, and ABN has suffered substantial losses as a result of funding the loans.

ABN asserts that this testimony does not constitute an inadmissible conclusion.  ABN claims that it is a fact that the borrowers defaulted on their loans, and that ABN has suffered losses as a result of such default.  ABN states that losses can be inferred from the fact that the borrowers failed to pay on the loans funded by ABN.  Stuckey has not explained how the statement is conclusory.  After review, the court finds paragraph 15 to be admissible.

Stuckey also contends that Federal Rule of Evidence 1002 (the best evidence rule) bars some of the testimony contained in Miller's affidavit.  Stuckey is attempting to use Rule 1002 to exclude testimony relating to documents other than those attached to the affidavit.  Specifically, Stuckey challenges Miller's statement that other loan applications appear to contain false and inaccurate information similar to that found in the attached documentation.  ABN first argues that Stuckey's argument is immaterial because ABN need only demonstrate a single misrepresentation to support its claims against Maximum Mortgage and Stuckey.   Thus, it is unnecessary for ABN to attach all 149 loan applications.  ABN next argues that Stuckey misconstrues Rule 1002.  Rule 1002 provides that in order to prove the contents of a writing, the writing itself must be produced.  However, Miller is not attempting to prove the contents of any

13

writing. Rather, Miller simply recites her observation that the loan documents (for all 149 loans) contain inconsistencies, and proceeds to make a reasonable inference based upon that fact. A witness with personal knowledge of a fact may testify to that fact even though the facts observed may also be contained in a document. United States v. Howard, 953 F.2d 610, 613 (11th Cir. 1992). Accordingly, the court will not strike any of the testimony in the Miller affidavit.

Continuing with its defense against Stuckey's summary judgment motion, ABN reiterates that Stuckey was employed by Maximum Mortgage as a loan originator at the time of the loan transactions at issue in this case. Stuckey also served as the Vice President of Maximum Mortgage during that time. According to Stuckey's deposition, although she did not originate the loans or submit the applications to ABN, she performed follow-up work for some of the loans prior to their closing, including verification of the investment income listed in the loan applications. This involved obtaining and reviewing leases for the properties identified as generating rental income to ensure they matched up with the information contained in the loan applications. Stuckey also testified that she may have served in an advisory role for employees who had questions regarding the loan transactions.

ABN notes that Stuckey has submitted an affidavit which states that "[o]ther individuals at Maximum Mortgage never solicited [her] opinion or sought [her] advice or direction as to any issue involved with the loans." But ABN further notes that in her deposition, Stuckey testified that she has done some "piecework" since signing her affidavit and realized that she may have had more involvement with the loans than she originally thought. (Stuckey Dep. at 98-99). Stuckey further testified that her affidavit is not meant to contradict her testimony that she had some involvement with the loans, and may have fielded some questions from employees about

14

the loans. (Stuckey Dep. at 100-01).

ABN again acknowledges that Stuckey has correctly pointed out that corporate officers and shareholders are generally not personally liable for the contractual obligations of the corporation.  However, ABN argues that it is well settled that a corporate officer "is personally responsible for the torts in which she has participated or which she has authorized or directed." State Civil Rights Comm'n v. County Line Park, Inc., 738 N.E.2d 1044, 1040 (Ind. 2000).  This principle of Indiana law has been applied not only in fraud actions, but in statutory and common law causes as well.  DFS Secured Healthcare Receivables v. Caregivers Great Lakes, Inc., 384 F.3d 338, 346 (7th Cir. 2004).

Stuckey, however, continues to argue that ABN has not submitted sufficient evidence to defeat summary judgment and that she has submitted an affidavit distancing herself from the loans at issue.  Stuckey's Affidavit states:

> 6.  I had no personal dealings with the individuals allegedly aggrieved by the actions set forth in Plaintiff's complaint.
>
> 7.  I had no contact with, interaction with, or responsibility for, the solicitation or processing of the loans that are [in] issue in the instant lawsuit.
>
> 8.  Other individuals at Maximum Mortgage Inc., never solicited my opinion, or sought my advice or direction as to any issue involved with the loans that are [in] issue in the present lawsuit. . .

Likewise, in her deposition, Stuckey initially attempted to distance herself rom the loan transactions.  However, when pressed on the issue, Stuckey admitted that she was involved in verifying information for some of the loan transactions prior to their closing.  Specifically, Stuckey testified as follows:

> Q. Was that your first specific involvement with these transactions, other than noticing the files and asking, What are these?
> A. Right, yeah, no, we didn't process or touch any of -- any of the files, of

15

these.
Q. Do you know who did?
A. I know that if I remember, Tracy Harrington did. And my recollection is just not that good to see if Tangi may have come down for a day to help and the same with myself.
It wasn't anything other than maybe we were gathering documents that we had any involvement at all.
Q. So you think Tangi and yourself may have come down to help compile the documents or --
A. Because I believe Justin and Terri were on vacation during a period of time during some -- during one of the borrowers, the last one.
**Q. And that would have been prior to closing that you may have helped organize some of the documents?**
**A. Right, right.**
Q. Would you tell me what exactly -- as best you can what exactly you would have been doing with the files?
A. The only thing that I can recall was that we were trying to again verify the data, and we were getting the leases and making sure all the leases and cross referencing that they were -- there were leased properties, because we were offsetting the rents.
**Q. So you were doing some of the background check stuff that ABN AMRO required?**
**A.  Right.**
**Q. And that primarily involved verifying some of the -- well, tell me what did that involve, some of the verification of the investment income?**
**A. Correct; if I remember right, the application had listed that, you know, if the property had investment rental, that -- whatever it was, whatever, $500 or whatever the lease was, we had to be sure there was a lease in the file.**
Q. Was that for the particular property being financed or was that for other properties being listed as income?
A. Could have been either.

Stuckey Dep. at 56-58 (emphasis added). Stuckey further testified as follows:

Q. You indicated on the loan transactions at issue in this lawsuit, the Nulls and Brogren transactions which involve Rex Wells, you indicated at some point when you were still in Angola, but prior to the closing of at least some of these loans, you came to Fort Wayne to help verify some of the information when the Stuckey's were on vacation, correct?
A. Correct.
Q. I would like to know if you could describe for me exactly at what point in the process of those loan transactions you got involved?
A. Well, the applications were already completed, the income documents and the asset documents were already completed. I think it was just literally a cross

16

>referencing of the properties listed on the application with the ones they were buying.
>**Q.  So you were primarily, if not exclusively, involved with verifying the various investment property income and the leases involved with those properties; is that correct?**
>**A.  Right, on the application, it stated there was a lease for one of the properties and we would dig through the stack of leases and match that up to make sure that there was a lease for that property as it was listed on the application.**
>Q.  And listed on the application as a source of income as opposed to a particular property being purchased; is that accurate?
>A.  Right, there would probably still be one there for the property being purchased as well.
>Q.  So you were kind of dealing with both, any investment property involved, you would verify the information, and the lease?
>A.  Right; once we got down to the, probably the bottom of the leases, I am sure there would be one left, it would go to the property itself.
>
>                                    ***
>
>Q.  But you didn't do any sort of cross-reference or verification; for example, if the loan application said that the borrower was receiving $300 a month in rent from a particular property, and you went and found the lease for that property, you
>wouldn't cross-reference and make sure that the $300 corresponded with the lease or would you?
>A.  We would, we would, but we wouldn't investigate further.
>**Q.  So you made sure that the information in the loan application matched up with the lease that you were --**
>**A.  Right.**
>**Q.  -- obtaining?**
>**A.  Correct.**

Stuckey Dep. at 89-91 (emphasis added).

ABN argues that Stuckey's own deposition testimony demonstrates that, contrary to her original affidavit, she was in fact directly involved with verifying information concerning the leases and rental income being generated by the borrowers prior to the closing of some of the loans.  ABN states that the lease and income verification documents are exactly the kind of false information provided to ABN, and that the inaccuracy of the information is apparent from the face of the documents themselves.  Thus ABN concludes that, at the very least, there are issues

17

of fact surrounding Stuckey's involvement in the loan transactions and her knowledge of the false information submitted in connection with those loans.

ABN further argues that, contrary to her original affidavit, Stuckey testified in her deposition that she may have served in a limited supervisory role with respect to the loan transactions. Specifically, Stuckey testified as follows:

> Q.   Is it possible that you may have been asked questions or your advice sought during that time in connection with the work you were performing on verifying the lease information?
> A.   If – if it came from anyone, it would probably come from Tracy, the processor for it.  And it would have been – probably would have been very limited questions, because Justin really took the reins for most part and took control of the files.
>    I mean there certainly could have been a question or two that could have been asked while I was down there.
> Q.   And last question, Paragraph 8 [of your Affidavit], which states, No one ever solicited your opinion or sought your advice or direction as to any issue involved with the loans.
>       That paragraph you believe it is possible wouldn't apply to some minor questions surrounding the limited involvement you had with the loan transactions at issue, correct?
> A.   Correct.

Stuckey Dep. at 99-102.  Stuckey also testified that she was the Vice President of Maximum Mortgage and, in that capacity, supervised employees. (Stuckey Dep. at 14, 25).

Thus ABN concludes that Stuckey's position as Vice President, the fact that she may have supervised employees in verifying information submitted to ABN, and her direct participation in the verification process create issues of fact with respect to her personal liability for the false information submitted by Maximum Mortgage.

This court agrees with ABN.  The record presented to the court by ABN sufficiently creates an issue of fact with respect to the degree of Stuckey's involvement with the allegedly fraudulent scheme upon which this case is based.  Therefore, summary judgment must be denied.

Conclusion

Based on the foregoing, Stuckey's motion for summary judgment is hereby DENIED.

Further, Stuckey's motion to strike the Miller affidavit is also hereby DENIED.

Entered: September 8, 2006.

s/ William C. Lee
William C. Lee, Judge
United States District Court